## MARY GALE *v.* ANDREW MATTA.

In a contest between the wife, who claims a tacit mortgage on immovable property sold by the husband after the right of mortgage accrued, and parties who claim through the privilege of the husband's vendor, the circumstance, that the act from which the privilege resulted, was not recorded, is fatal to the pretensions of the latter.

The law gives to the wife a tacit mortgage upon the husband's immovable property, dating from the conversion of her paraphernal funds to his own use.

Prescription is suspended during marriage, when the husband, having sold an hereditary estate of the wife, without her consent, is bound in warranty for the validity of such sale; and in every case where the action of the wife may be prejudicial to the husband. C. C. 349.

APPEAL from the District Court of the parish of East Baton Rouge, *Burk, J.* J. M. *Elam*, for the plaintiff. *George S. Lacy*, for the defendant. By the court:

SLIDELL, J. This is an hypothecary action, in which the plaintiff, a married woman, seeks to enforce her tacit mortgage against a lot of ground, now owned by the defendant.

The defendant having denied the existence of the alleged claims of the plaintiff against her husband, *James D. Stuart*, it is necessary, first, to ascertain the existence and amount of his indebtedness.

In 1843, *Mrs. Stuart* brought suit against her husband for a separation of property, and to enforce her claims against him for paraphernal property converted to his own use. In her petition, she alleged two items of indebtedness, one for the sum of $1800, for so much money received by her husband

from the estate of her father, the other for the sum of $1250, the alleged proceeds of the sale by him of two slaves belonging to her. She obtained a judgment against her husband for $2940. From the evidence now offered, which consists in part of the testimony of the same witness who testified in the plaintiff's suit against her husband, it does not appear that the amount received by *Stuart* from the estate of his wife's father, exceeded $1500. This indeed was the extent of proof as to that item in the previous suit. With respect to the other item of $1250, it appears that such was the price at which the wife obtained the slaves at the probate sale of her father's estate; but the price at which her husband subsequently sold them is now shown to have been $700. It appears, therefore, that the true amount of the wife's claim against her husband is a capital sum of $2200. She collected by *fieri facias* against her husband, on the 14th April, 1845, $1222, which left, after the allowance of interest and costs, a balance due on that day of $1235 50. For this amount the law gave her a tacit mortgage upon the husband's immovable property, dating from the conversion of her paraphernal fund to his own use, which date is prior to the purchase by *Stuart* of the property now owned by the defendant.

The defendant attempts, on various grounds, to escape the effect of this tacit mortgage.

The lot of ground now owned by the defendant, was bought by *Stuart* from the syndics of *Alfred Gates*, an insolvent debtor, in 1838, for $4000, payable as follows, as expressed in the deed of sale: "$1200 are to be paid to the Bank of Louisiana, in discharge of a bond subscribed by *Alfred Gates* to said bank; $1600 to *Mansker*; and for their liabilities as endorsers on a note due to the Carrollton Bank, for which, the above named amount, the said house and lot are mortgaged; and the balance of $1200 is payable in one, two, and three years from the day of sale, for which balance, the said purchaser furnished three notes of $400 each." In 1840, *Stuart* sold the lot to *Nancy McGilligan*, at the price of $4000, of which amount a part was paid in cash; and for the residue, the purchaser assumed the payment of various debts due by *Stuart*, and enumerated in the deed. Among these, were an amount of $800 due to the Bank of Louisiana, on the 16th April, 1840, and a note of *Stuart*, endorsed by *A. Matta*, and *A. Adams*, due 26th October, 1840, for $1200, and held by the Carrollton Bank.

In 1843, *Nancy McGilligan* sold the lot to *Matta*, the defendant, who has possessed it since that time.

Although the evidence is somewhat obscure, there is perhaps enough to satisfy the mind, that *Matta* paid two thousand dollars upon the claims of the Bank of Louisiana, and of the Carrollton Bank. The debt due to the Bank of Louisiana, which existed in the form of a bond for $2000, bearing date the 16th April, 1833, and signed by *Alfred Gates* and *Andrew Matta*, as principals, and *James Mansker*, as surety, does not appear to have been novated. It had been reduced by partial payments from time to time, and on the 10th April, 1841, *W. B. Knox*, made a payment upon it of $800. *Knox* testifies that he made this payment for the benefit of *Matta*.

The debt to the Carrollton Bank, which *Stuart* assumed in the deed by which he purchased the lot, in 1838, seems to have been novated. It first existed in the form of a note made by *Gates* and *Matta*, endorsed by *Mansker* and *Dewey*, dated 27th October, 1836, at 12 months, for $2000. This claim, after passing through various renewals, and being reduced from time to time, appears on the

GALE
*v.*
MATTA.

24th October, 1839, in the form of a note made by *J. D. Stuart,* endorsed by *Matta, Adams* and *Mansker,* for $1200, at twelve months ; and it would seem that *Matta* took up this last mentioned note, on the 22d October, 1840, with his own means.

Now, the argument is, that the agreement of *Stuart* to pay the claims of the Bank of Louisiana, and the Carrollton Bank, formed part of the price of that purchase, and was protected by the vendor's privilege ; and that when *Matta* paid the balances remaining due upon those claims, he became legally subrogated to all the privileges of *Stuart's* vendor.

Aside from other difficulties which surround the pretensions of the defendant, an insurmountable obstacle' to his success is found in the fact, that there is no evidence to show that the vendor's privilege arising from the sale to, *Stuart,* or the mortgage granted in it, were preserved or made effectual by registry. Whether any registry was ever made or not, it at least appears, that no such encumbrance was of record against *Stuart* in the year 1840, when he sold to *Nancy McGilligan.* And it is quite material here to add, that, in a tableau of distribution, filed in the year 1839, by *Matta,* as the syndic of the creditors of *Gates,* he makes the following statement: " The store on Church street was sold to *James D. Stuart* for $4000 ; but, as that property was specially mortgaged to the Louisiana Bank, for the sum of $1200, and also to *Messrs. Mansker* and *Dewey,* for the sum of $1600, to secure them against their endorsements for that sum to the Carrollton Bank, such arrangements were' made with the purchaser and with the said *Mansker* and *Dewey,* and with the said banks, that said mortgages were satisfied, and the notes of said *Gates* in favor of said banks were taken up ; and for the balance of the price, being $1200, the said *J. D. Stuart* gave his three notes, agreeable to the terms of the sale."

It seems to be assumed in argument by the defendant's counsel, that a distinction can be made between a wife and other mortgage creditors ; and it is said, that " if there were no subrogation, equity, if not law, would forbid the wife's mortgage from resting upon any property belonging to her husband, until she had paid to another the sum by him advanced for the purpose of discharging the price."

That under some circumstances a distinction may be made between a wife and a third person, may be true. The case of *Dejean's succession,* 5th Ann. 594, cited by the defendant, affords an illustration. But in this case, *Mrs. Stuart* is separated in property from her husband, and we have been unable to discover any sufficient reasons for arresting her in the enforcement of her tacit mortgage upon the land in question. Our laws, granting the wife a mortgage, rendering it operative against third persons without registry, and thus sacrificing to her interests the rights of those whom her husband is bound to warrant and defend, may be harsh in their effects, and anti-commercial in their character. But these are considerations of policy which are out of our province.

With regard to the plea of prescription of ten years, we are of opinion that it cannot be sustained. Prescription is suspended during marriage, when the husband, having sold an hereditary estate of the wife without her consent, is bound in warranty for the validity of such sale; and in every case where the action of the wife may be prejudicial to her husband. Civil Code, 3491. C. N., 2256, Rogron. Pothier, Traite de la Prescription, No. 25.

As to the alleged right of discussion, it is sufficient to say it has not been properly exercised. See Civil Code, 3366, 3016. *Robechot v. Folse,* 11. L. R. 136. .

The district court erred in giving an absolute judgment against the defendant personally. This was not consistent with the provisions of the Civil Code and Code of Practice, nor with the prayer of the petition. See C. C. 3363, 3364. &c. C. P. 68, 69. We will give the plaintiff a judgment for the enforcement of her mortgage, according to the prayer of her petition, and for the amount really due to her by her husband.

It is therefore decreed, that the judgment of the district court be reversed. And it is further decreed, that the said defendant, *Andrew Matta*, do, within ten days from the date when this decree becomes final, pay to the said plaintiff, *Mary Gale*, wife of *James D. Stuart*, the sum of $1235 50, and interest thereon, from 14th April, 1845, until paid, and costs of this suit in the court below; and that in default thereof, the said plaintiff have leave to seize and sell according to law, the real estate described in the petition, and in the act of sale dated 3d November, 1838, by *Gates* and *Matta*, syndics to *James D. Stuart*, whereof a copy is to said petition annexed, together with the buildings and improvements thereon. That in addition to making the usual total appraisement of said land and buildings and improvements preparatory to such sale, a separate estimate be made at the same time, by the appraisers, of the increased value at the time of the appraisement, which is the result of the brick buildings thereon erected, and a separate estimate of the said land and improvements without said brick buildings; and that in distributing the proceeds of said sale, the said defendant be entitled to receive thereout, a proportional part for the said increased value by reason of said brick building, and that the other proportional part of said proceeds, be applied to the payment of the plaintiff's claim. The appraisements so to be made, to be subject to revision by the court below, if either party so desire, upon rule for distribution of the proceeds of sale. And it is further decreed, that the plaintiff pay the costs of this appeal.